**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America ex rel.** | ) | |
| **ASHWANI SHAMLODHIYA, R41722,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 8313** |
| | ) | |
| **KEVWE AKPORE, Warden,** | ) | **Judge Rebecca R. Pallmeyer** |
| **Hill Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In April 2001, Petitioner Ashwani K. Shamlodhiya moved to West Chicago; rented a bedroom in the home of Michael Li and his wife, Susan; and promptly began a sexual relationship with Susan Li. Then, on the morning of September 11, 2001, Petitioner and Michael got into an altercation. Petitioner struck Michael in the head with a hammer three times, killing him, and started a fire in the Li home. The State charged Petitioner with arson and first-degree murder. Petitioner has maintained throughout that Michael attacked him and that the killing was in self-defense.

Petitioner had two jury trials in 2004, one in April, and one in October. In the April trial, a jury convicted him of arson and residential arson but was deadlocked on the murder charge because it "could not agree on a verdict among its choices of first degree murder, second degree murder, involuntary manslaughter, and not guilty based on self defense." (Rule 23 Order, *People v. Shamlodhiya*, No. 2-05-0200, 373 Ill. App. 3d 1165, 943 N.E. 2d 339 (Table), 348 Ill. Dec. 14 (Jul. 18, 2007), Ex. A to Answer (hereinafter "2007 Appellate Order") [23-1] at 2.) In the October trial, a jury convicted Petitioner of first-degree murder after receiving only first-degree murder, involuntary manslaughter, and self-defense instructions. Petitioner directly appealed his

murder conviction and completed postconviction proceedings in state court. Petitioner is currently serving his 22-year first-degree murder sentence.[1]

Shamlodhiya petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He seeks relief for the alleged ineffective assistance of his trial counsel, arguing (1) that his counsel misinformed him about their trial strategy at the second trial, causing him to "forego [a] second degree murder instruction to the jury," and (2) that his trial counsel "without consulting [him], nullified the submission of [an] involuntary manslaughter" instruction at the second trial. (*See* Petition [7] at 15, 19.) Petitioner also requests that this court "reduce first degree murder to second degree murder," (*id.* at 22), or that it grant "any relief [the court] feels deserving, that law & justice requires." (Reply [55] at 7.)[2] As explained here, Shamlodhiya's petition is denied.

## BACKGROUND

### I.  Factual Background

Absent clear and convincing evidence to the contrary, the court presumes that the "state court's account of the facts are correct." *Coleman v. Hardy,* 690 F.3d 811, 815 (7th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1); *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005)). The facts below are derived from the last state court opinion fully discussing the factual background of the case (2007 Appellate Order) and from the October trial transcript.[3]

---

[1]      His four-year arson sentence is to be served consecutively. The arson conviction and sentence are not at issue here.

[2]      Petitioner also requests that the court "grant [him] a new trial for 1st-degree murder or please request Assistant Appellate Defender Thomas Karalis . . . to represent me in P.L.A." (Ex. A to Petition [7-1] at A112).

[3]      Illinois appellate courts issued several subsequent opinions in this case during postconviction proceedings. *See* Rule 23 Order, *People v. Shamlodhiya*, No. 2-08-0440, 404 Ill. App. 3d 1178, 996 N.E. 2d 776 (Table), 374 Ill. Dec. 1081 (Nov. 3, 2010), Ex. I to Answer (hereinafter "2010 Appellate Order") [23-9] (reversing and remanding the circuit court's denial of Petitioner's state postconviction petition); *People v. Shamlodhiya*, 2013 IL App (2d) 120065, 986 N.E. 2d 204, 369 Ill. Dec. 255, *reh'g denied* Apr. 26, 2013. (hereinafter "2013 Appellate Opinion"), Ex. M to Answer [23-13] (affirming the circuit court's denial of Petitioner's state postconviction

Shamlodhiya, originally from India, completed a master's degree at the University of Miami. (Petition at 13; 2007 Appellate Order at 13–14.) He then took a job in DuPage County and moved to West Chicago in April 2001, renting a room in the home of Susan and Michael Li. (2007 Appellate Order at 6.) "Shortly after" he moved in, Petitioner began a sexual relationship with Susan Li. (*Id.*) Those relations ended in May 2001 but were rekindled briefly in August of the same year while Michael was out of town. (*Id.* at 6, 14.) Susan testified at trial that she thought her husband knew about her relationship with Petitioner. (*Id.* at 7 ("On cross-examination, when asked whether Michael knew about her sexual relationship with defendant, Susan replied, 'I think so, yes.'").) Her testimony was somewhat equivocal on this score, however. Asked what she told her husband about having sex with Petitioner, Susan responded, "I forgot." (*See id.* at 7.) She also "forgot" whether she had "specifically asked [her] husband if [she] could have sex with [Petitioner]." (*Id.* at 8.) After several other evasive answers, the trial judge reminded Susan during a recess that "she was under oath and must answer the questions posed her." (*Id.* at 9–10.) The judge also "admonish[ed] her that she must answer questions truthfully," and "questioned the veracity of her testimony under cross-examination." (*Id.* at 10.) On re-direct examination, Susan acknowledged having told police that she "only [slept] with [defendant] because Mike gave [her] permission" and that her statement to the police was true. (*Id.* at 11.)

Petitioner's testimony at his April trial (that transcript was read to the jury in the October trial) conflicted with Susan's.[4] In an apparent effort to establish that Michael attacked in in a

---

petition on remand). Neither opinion provides the full factual background of the case: the 2010 Appellate Order recounts only portions of the statements of Shamlodhiya's defense counsel's closing argument, and the 2013 Appellate Opinion directs readers to the 2007 Appellate Order for background information, recapping only information relevant to the postconviction appeal.

[4]    Shamlodhiya testified at his both the April and the October trial. During the October trial, "the State [ ] read a transcript of [Petitioner's] testimony from his [April] arson trial to the jury." (2007 Appellate Order [23-1] at 13.) The Illinois Appellate court explained that "[m]uch of his testimony [in October] repeated his testimony from his previous trial." (*Id.* at 21.)

jealous rage, Petitioner testified that Michael did not know about Petitioner's relationship with Susan and had only been "suspicious." (*Id.* at 14.) He testified further that, in August, Susan had told him "that she intended to tell her husband about their relationship, but [Petitioner] convinced her to delay telling Michael until after [Petitioner] moved out of the house in December or January." (*Id.*)

On the morning of September 11, 2001, Susan had already gone to work, and Michael agreed to take Petitioner to work because Petitioner was having car trouble. Michael first took his and Susan's 9-year-old son to the bus stop nearby while Petitioner waited at home. Petitioner then testified that he heard talking, and he came downstairs from his upstairs bedroom to see "Michael standing near a telephone rubbing his head." (*Id.* at 15.) The 2007 State Appellate opinion recounts what happened next:

> [Shamlodhiya] asked Michael who was on the telephone, but Michael simply stared at the floor and did not respond. When [petitioner] asked a second time, Michael asked him why he was asking. Michael told [petitioner] that it was none of his business, and he said the word "business" "so loudly like a little bit of saliva just came out of his mouth." [Petitioner] noted that Michael appeared to be angry. Michael asked defendant why Susan's picture was in his room, and, after the two walked up to defendant's room and Michael showed defendant a picture of Susan from defendant's drawer, defendant explained that Susan had given him a picture for a website defendant was to design for her. . . . Defendant left his room and went downstairs, and Michael followed him.

(*Id.*) Petitioner's theory was that Susan had called from work to tell Michael about her relationship with Petitioner; Susan herself denied having done so. She "testified that . . . she did not call Michael and admit her relationship with defendant" that morning. (*Id.* at 7.)[5]

Once downstairs, "[Petitioner] resolved to leave Michael alone for a while in order to give [Michael] time to calm down, and [Petitioner] started to unlatch the front door to go outside." (*Id.*

---

[5]     Telephone records submitted to the jury showed that Susan called home twice on the morning of September 11, between 8:34 and 8:35, and each call lasted less than one minute. (*Id.* at 45.) Although he "did not know precisely when," Petitioner testified that he believed "the school bus picked up the Lis' child at 8:43 a.m." (*Id.*)

at 15.)  It appears the he got so far as unlatching the front door.  (*Id.* at 18.)  He did not leave, however; "Michael told [Petitioner] that they needed to leave," presumably so that Michael could take Petitioner to work.  Instead of going out the door, Petitioner "turned around and started walking toward the kitchen area" where Michael was.  (*Id.* at 15.)

In the kitchen, Petitioner claimed, Michael began asking Petitioner questions about his relationship with Susan.  After Michael asked Petitioner whether he had slept with Susan, Petitioner testified that Michael hit Petitioner in his "private parts."  (*Id.* at 16.)  Petitioner "fell to his knees on the floor, and Michael hit him again."  (*Id.*)  Petitioner testified that Michael then "pulled a hammer out of a drawer.  Upon seeing the hammer, [Petitioner] tried to run to the laundry room, but Michael followed him and hit him on the back of the head.  [Petitioner's] next memory was waking up on the floor while Michael was holding him by the neck."  (*Id.*)  Michael then struck some of Petitioner's fingers with the hammer.  (*Id.*)

After a struggle, Petitioner "won control over the hammer."  (*Id.*)  "Michael chased him around the center island of the kitchen and began throwing utensils at him and imploring him to 'come here.'  On cross-examination, [Petitioner] explained that he used the kitchen island to protect himself while Michael chased him."  (*Id.*)  There was a sliding glass door or window in the kitchen, but Petitioner acknowledged that he made no effort to exit through it.  (*See* Shamlodhiya Testimony, Ex. YY to Answer (hereinafter "Shamlodhiya Testimony") [27-13] at 185:2–6 ("Q.  So you could have just run right out here through that glass, sliding glass window, correct?  A.  Yes, sir.  Q.  But you didn't?  A.  No, sir, I did not.");  *id.* at 190:1–8 (pointing out, on cross-examination, another opportunity Petitioner had to exit the sliding glass door).)  The State emphasized on cross-examination that Shamlodhiya never attempted to exit that door during the altercation.  (*See, e.g.*, *id.* at 187:6–10; 2007 Appellate Order at 18–19, 23–24.)

Petitioner testified that he approached the home phone and told Michael he was going to call the police.  (Shamlodhiya Testimony [27-13] at 187:11–188:3.)  He walked away from the

phone, however, when Michael "came very fast towards [him] with his hand behind his back." (Shamlodhiya Testimony [27-13] at 188:6–8.) He testified that Michael then unplugged the phone. (2007 Appellate Order at 24–25; Shamlodhiya Testimony [27-13] at 189:2–7.) After that, Michael swung at him with a knife, but Petitioner "pushed him back with the hammer," striking Michael in the face. (2007 Appellate Order at 17.)

> [Petitioner] was backing up during the confrontation, and he backed up further as Michael continued toward him. Michael "came very fast *** with the knife," and [Petitioner], who "was scared," "just hit him at that time." [Petitioner] hit him once on the left temple or left forehead, and twice more in the head when Michael continued towards him. [Petitioner] struck all three blows before Michael went to the ground.

(*Id.* (modifications in original).) The forensic pathologist who later conducted an autopsy on Michael confirmed at trial that Michael's skull had "three depressed skull fractures: the first above the left eye on the forehead, the second above the right ear on the side of his head, and the third on the back of the head 'a little to the right of the mid-line.' " (*Id.* at 4.) The autopsy also revealed "two bruises on the head," "lacerations under the victim's scalp, on the lip, below the eyebrow, and on the right cheek," and Michael's "nose also appeared to have been broken." (*Id.*) According to the pathologist, "any of the three skull fractures could have been fatal." (*Id.* at 5.)

After striking Michael with the hammer, Petitioner explains that he "started to leave," but "realized that Michael was dead" and "panicked." (*Id.* at 17.) He took Michael's body to the basement of the home and decided to "try to make the whole incident look like a robbery." (*Id.*) Petitioner testified that he removed the knife Michael had brandished, cleaned it, and put it somewhere else to promote the appearance of a robbery. (Shamlodhiya Testimony [27-13] at 168:8–169:18.)

Eventually, Petitioner decided to commit suicide. (2007 Appellate Order at 17.) First, he tried to hang himself in the basement, but he "lost his nerve." (*Id.*) He then "decided to asphyxiate himself by starting a fire" in the basement. (*Id.*) He started two fires—"one near the top of the stairs and another under the stairs." (*Id.* at 18.) Shortly after starting the fires, he escaped the

6

house and summoned help.  He told the police that an intruder had attacked him and Michael, but, "[o]n cross-examination, [Petitioner] agreed that the entire story he told police about an intruder was a lie." (*Id.*)  Petitioner was taken to the hospital for his injuries.  An officer who visited him in the hospital testified that Petitioner "had a bruise on his forehead, a swollen and red right cheek, a swollen and bruised lower lip, and a bruised and scraped left hand.  There was also dried blood on defendant's lip, left hand, and chest.  [The officer] did not notice any knife wounds on [Petitioner]." (*Id.* at 11.)  Another officer testified that Petitioner's "lips, right cheek, and left forehead appeared to be swollen [and that his] left hand was bandaged." (*Id.* at 5.)  Petitioner was arrested a few days later.

As noted earlier, Petitioner was tried twice for murder.  The jury was deadlocked on the murder charge during the April 2004 trial.  Following that trial, Shamlodhiya turned down the State's offer to have a "bench trial on stipulated evidence" on a charge of second-degree murder. (*People v. Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 2, 986 N.E. 2d 204, 369 Ill. Dec. 255, *reh'g denied* Apr. 26, 2013 (hereinafter "2013 Appellate Opinion"), Ex. M to Answer [23-13].)  He was re-tried for murder in October 2004.  There, he was represented by two public defenders, Robert Miller and Thomas Ost.  Near the end of that trial, the court held a hearing on jury instructions. (*See* Trial Transcript, Ex. FF to Answer (hereinafter "Trial Transcript") [25-9] at 958:1–968:24.)  Both Mr. Ost and Petitioner himself confirmed for the court that the "[involuntary manslaughter instruction] is being given at the request and with the understanding of" Shamlodhiya.  (2007 Appellate Order at 25; Trial Transcript [25-9] at 964:6–14.)  Petitioner also informed the court that he had conferred with his attorneys and did not want a second-degree murder instruction. (*See* Trial Transcript [25-9] at 966:13–967:1 ("The Court: Is it correct then that you are not asking that that [second degree murder] instruction be given?  Defendant Shamlodhiya: Yes, sir. . . . The Court: You talked to your attorneys about that and that's your decision, is that correct, with their

advice?  Defendant Shamlodhiya: Yes, sir.").)[6]  These jury instructions, along with the contents of the closing arguments from trial, lie at the heart of Shamlodhiya's habeas corpus petition.

In closing, the prosecutor re-capped how Petitioner had changed his story to the police multiple times.  The prosecutor also emphasized Petitioner's intelligence and education while disparaging Petitioner's trial testimony.  (Trial Transcript [25-9] at 998:21–999:12 (describing the ways the prosecution believed Petitioner had changed his story over time); *id.* at 1021:6–8 (arguing that "this smart guy had a plan.  He had a plan."); *see also id.* at 1092 (calling Petitioner "a liar" during rebuttal).)[7]  The prosecutor further emphasized Petitioner's opportunities to avoid confrontation with Michael.  (*See* 2007 Appellate Order at 30 (quoting the State's closing: "Now, the defendant did not run away.  Defendant said he panicked.  He just didn't think of it. . . . What is the most instinctual thing to do when someone is coming after you?  To get the heck out of there, and he had every opportunity to do that.").)  In making this argument, the prosecutor told the jury:  "Defendant has numerous times to escape and never does. . . .  He doesn't have to run. The law says he does not have to run.  You will get an instruction on that."  (*Id.*)  The jury was never given a no-duty-to-retreat instruction, however.  Finally, the State argued that "[i]f you look at the facts and circumstances of this case, involuntary manslaughter couldn't apply" because there was "[n]othing reckless" about Shamlodhiya's actions.  (Trial Transcript [25-10] at 1024:12–1025:3; *see also id.* at 1025:15 ("Involuntary manslaughter does not apply.  Under the law, it might, but the facts of this case, absolutely not.").)

_____

[6]     The parties also confirmed that first-degree murder and self-defense instructions would be given.  (Trial Transcript [25-9] at 25:16–18, 30:7–19.)

[7]     Several pages of the trial transcript appear to be missing from the State's exhibits. The last page of transcript in Exhibit FF, page 1000, does not align with the first page of Exhibit GG, page 1001.  Thus, the court relies, in part, on the 2007 Appellate Order, which quotes parts of the parties' closing statements.

In the defense closing, Attorney Miller made a self-defense argument; he emphasized the reasons Michael had for attacking Petitioner first and recounted Petitioner's account of the aggression. (*See, e.g.*, *id.* at 1038:23–1039:14, 1040:12–1046:17.) Miller also reminded the jury about the involuntary manslaughter instruction:

> [The] Judge will give you the choice of looking at involuntary manslaughter and deciding whether or not that is the charge that [Petitioner] is truly guilty of.
>
> I consider that a compromise verdict. This has been a trial of self defense. We started with self defense and we are ending with self defense, because that is the truth; and every piece of physical evidence . . . supports [Petitioner's] version of what occurred; that is self defense.
>
> Now, the State may try to argue to you yet, but the evidence still supports involuntary manslaughter. They may argue, why don't you compromise? We are not asking you that. It's a case of self defense.
>
> I don't want the compromised verdict, and I don't want first degree murder, because the State can't prove it.

(*Id.* at 1089:1–18.)

The state doubled down on Miller's statements about involuntary manslaughter during its rebuttal: "I do agree with counsel on one thing. Involuntary manslaughter has nothing to do with the case. Counsel says, don't consider it. I agree. He's absolutely right. It has nothing to do with this case. It's a murder case." (*Id.* at 1109:19–23.) After closings, the court gave the jury instructions on first-degree murder, involuntary manslaughter, and self-defense. Neither party submitted an instruction regarding defendant's duty to retreat, and none was given. (2007 Appellate Order at 31.) The jury returned a guilty verdict on the first-degree murder charge, and Petitioner was ultimately sentenced to twenty-two years in custody.

## II.    Post-Trial Proceedings

Following his conviction, Petitioner "filed a *pro se* posttrial motion alleging ineffectiveness of counsel, and the trial court held a preliminary hearing on the motion on January 6, 2005." (*Id.* at 31.) In his motion, Petitioner argued that his counsel should have requested a no-duty-to-retreat instruction. He also argued that the trial court should have given a second-degree murder

9

instruction, despite his having specifically confirmed to the trial judge that he did not want such an instruction. That motion, and a later one (not identified in this record) were denied. (2007 Appellate Order at 32.)

Petitioner Shamlodhiya then directly appealed his conviction through counsel. He first argued that the prosecution's statements about a forthcoming no-duty-to-retreat instruction that was never actually tendered deprived him of a fair trial. The Appellate Court disagreed, finding that "none of the items [Petitioner] complains of were actually error, or, in any event, were sufficiently prejudicial to be reversible error, either individually or in total." (*Id.* at 38.) He also argued that some of the factual contents of the prosecution's closing argument caused undue prejudice. The Appellate Court rejected that argument, too, and Petitioner has not raised those issues in this habeas petition.

More importantly for this case, Petitioner also argued that his defense counsel was ineffective when they "tendered instructions on involuntary manslaughter pursuant to [Petitioner's] wishes but subsequently disavowed the lesser offense without any apparent consent from [Petitioner]." (2007 Appellate Order at 1; *see* Brief and Argument for Defendant-Appellant, Ex. B to Answer [23-2] at 58.) The Appellate Court denied Shamlodhiya's appeal on these grounds as well, but later granted a petition for rehearing solely on this issue. Upon rehearing, the court did not issue a new opinion; instead, the panel modified its original opinion. (2007 Appellate Order at 42–44; Answer [22] at 15; Petition for Rehearing, Ex. E to Answer [23-5].) The ruling majority explained that it understood Petitioner's position "not [to be] that counsel's argument equated to a withdrawal of the jury instruction on the lesser included offense, but rather that counsel's argument undermined defendant's decision to tender the [involuntary manslaughter] instruction." (2007 Appellate Order at 42; *see id.* at 49 (Johnson, J. dissenting "on the issue of whether a defense attorney may, through his closing argument, advise the jury to disregard the defendant's decision to tender a lesser included offense instruction to the jury").) The court explained that a

criminal defendant *does* have "the exclusive right to decide whether to submit an instruction on a lesser-included offense." (2007 Appellate Order at 39 (quoting *People v. Medina*, 221 Ill. 2d 394, 403–04, 851 N.E. 2d 1220, 303 Ill. Dec. 795 (2006)).)[8] But it ultimately "reject[ed] [Petitioner's] premise that [his] counsel's [closing] argument [ ] effectively undermined the jury instruction even though the instruction was actually tendered," because "jurors are presumed to follow the court's instructions," regardless of counsel's closing arguments. (2007 Appellate Order at 43 (citing *People v. Malave*, 230 Ill. App. 3d 556, 563, 595 N.E. 2d 117, 123, 172 Ill. Dec. 54, 60 (1992)).) The court observed that defense counsel's closing argument could have had "a discernable strategic advantage" and affirmed Shamlodhiya's conviction. (2007 Appellate Order at 43.) Petitioner's Petition for Leave to Appeal ("PLA") was denied by the Illinois Supreme Court on November 29, 2007. (Petition for Leave to Appeal, Ex. G to Answer [23-7]; Denial of PLA, Ex. H to Answer [23-8].)

Early in 2008, Petitioner initiated state collateral proceedings, raising some similar and some new issues.[9] (*See* Postconviction Petition, Ex. Y to Answer [24-16] at PageID # 2192.) Relevant to the present Petition is Shamlodhiya's argument, echoing his argument on direct

---

[8] Such a right is recognized as a matter of Illinois law. *See People v. Brocksmith*, 162 Ill. 2d 224, 229, 642 N.E.2d 1230, 1232 (1994) ("As the comments to the ABA Standards suggest, we believe that the decision to tender a lesser included offense is analogous to the decision of what plea to enter, and that the two decisions should be treated the same."). Failure of a state court to give a lesser-included-offense instruction is not, by itself, a basis for habeas relief; instead, "the question is . . . whether failure to do so constituted a defect so fundamental that it results in a complete miscarriage of justice or omission inconsistent with the standards of fair procedure." *Reeves v. Battles*, 272 F.3d 918, 920 (7th Cir. 2001).

[9] New grounds for relief, not raised in the petition before this court, included that trial counsel failed to call as a witness a doctor "who could have testified" that Shamlodhiya "did inform him of the pain in the back of [his] head," supporting Petitioner's contention that Michael was the initial aggressor; that trial counsel failed to elicit on cross-examination that Susan "ha[d] been taking antidepressant medications," apparently at the time of trial; and that his appellate counsel on direct appeal failed to raise several ineffective assistance of trial counsel claims. (*See* Postconviction Petition, Ex. Y to Answer [24-16] at PageID ## 2194–98.)

appeal, that his "[t]rial counsel told the jury to abandon Involuntary Manslaughter. . . . Trial counsels never informed me prior to closing argument that they would ask the jury to ignore Involuntary Manslaughter." (Postconviction Petition, Ex. Y to Answer [24-16] at PageID # 2194.) Petitioner also argued that appellate counsel was ineffective for failing to raise a claim of ineffective assistance of counsel, based on trial counsel's failure to request a second-degree murder instruction. (Memorandum Opinion, Ex. Z to Answer [25-1] at PageID # 2271.) The trial court denied all of Petitioner's claims in a written memorandum. (*Id.* at PageID # 2265.)

Petitioner appealed, through new counsel, raising "a single issue—whether his trial attorney was ineffective for abandoning defendant's request that the jury consider . . . involuntary manslaughter[ ] during closing argument." (Rule 23 Order, *People v. Shamlodhiya*, No. 2-08-0440, 404 Ill. App. 3d 1178, 996 N.E. 2d 776 (Table), 374 Ill. Dec. 1081 (Nov. 3, 2010), Ex. I to Answer (hereinafter "2010 Appellate Order") [23-9], at PageID # 683; *see* Brief and Argument for Plaintiff-Appellee, Ex. K to Answer [23-11].) The Second District Appellate Court reversed and remanded in November 2010, determining that "[D]efendant has identified an arguable basis in both law and fact regarding his claim . . . sufficient to survive the first stage of postconviction proceedings." (*See id.* at 4.)[10]

---

[10]     The appellate court also determined that *res judicata* did not preclude Shamlodhiya's postconviction petition, relying on a footnote in the 2007 Appellate Order that, in the 2010 Appellate Court's view, "expressly reserve[d] . . . [Shamlodhiya's] right to bring a subsequent action." (2010 Appellate Order at 5 (citing *People v. Carroccia*, 352 Ill. App. 3d 1114, 1124, 817 N.E.2d 572, 288 Ill. Dec. 214 (2004)).) (*Res judicata* had been the state's only response in the postconviction appeal.) That footnote read: "To the extent there is some evidence, not in the record on appeal, that defendant did not agree [for his trial counsel not argue involuntary manslaughter], that is not a matter we are able to consider in this appeal. . . . Our view is that the proper procedure for bringing forth such evidence lies elsewhere (*eg.* [sic], under post-conviction proceedings . . . )." (2007 Appellate Order at 42 (citation to state statute omitted).) Petitioner, seizing on this invitation, attached an affidavit from one of his trial attorneys to his postconviction petition, as evidence that Petitioner had not agreed with trial counsel's closing tactic. The 2010 Appellate Court reviewed that affidavit and explained that, while the 2007 decision *had* foreclosed the issue of "disavowal" of the involuntary manslaughter instruction, it had not definitively determined whether trial counsel had "withdrawn" the instruction. (2010 Appellate Order at 5–6.) (Neither the 2007 nor the 2010 Appellate Order identifies a clear

On remand, Petitioner moved *pro se* to amend his petition to include, in addition to his previously-raised grounds, the argument that, if his trial counsel had told him "that [counsel] would argue to jury to ignore involuntary manslaughter . . . then I would have made an 'intelligent and informed decision' to give 2nd-degree murder instruction to the jury." (Motion to File Supplement to Amend Post-conviction Petition, Ex. Z to Answer [25-2] at PageID # 2442.) This *pro se* motion followed, by two days, a petition filed by counsel who made a slightly different argument: that, "[h]ad Defendant been aware that trial counsel would abandon the pursuit of a finding of guilt on involuntary manslaughter, Defendant would have explored his other options to resolve this case, including pursuing a bench trial." (Amended Petition for Post Conviction Relief, Ex. Z to Answer [25-1] at PageID # 2320, 2322.) Under those circumstances, counsel urged, Petitioner may have been found guilty for second-degree murder instead of first-degree murder. (*Id.*)

The trial court granted an evidentiary hearing on whether trial counsel's statements about involuntary manslaughter during closing were "trial strategy or inadvertent," dismissing all of Petitioner's other claims. (Hearing Transcript of Nov. 7, 2011, Ex. ZZ to Answer [27-15] at PageID # 8738; *see also* Hearing Transcript of Nov. 10, 2011, Ex. ZZ to Answer [27-15] at PageID # 8745 ("We can't, frankly, keep rehashing these issues every time the defendant, pro se, decides he wants to raise another issue."); Brief and Argument for Petitioner Appellant, Ex. N to Answer [23-14] at 16 (explaining that, with the exception of the involuntary manslaughter issue, "the [trial] court granted the State's motion to dismiss" all other postconviction claims on remand).) At the December 2011 evidentiary hearing, Attorney Miller testified that he did not intend to tell the jury

---

distinction between "disavowal" and "withdrawal," but the opinions suggest that these courts view disavowal as a strategy-based determination that can be made by an attorney, while withdrawal implicates the criminal defendant's rights under state law (discussed *infra* n. 8.) (*See* 2007 Appellate Order at 38–42; 2010 Appellate Order at 6.)) Because the 2010 Appellate Order concluded that the attorney's affidavit appeared to address withdrawal (the issue reserved the in 2007 footnote), claim preclusion did not bar the argument.

not to consider involuntary manslaughter. (*See* Hearing Transcript of Dec. 27, 2011, Ex. ZZ to Answer [27-15] at PageID # 8780:9–19 (testifying that he did not object when the prosecution, in rebuttal, characterized his closing argument as telling the jury "not to consider involuntary manslaughter," but explaining that that messaging "wasn't [his] intent . . . Maybe that was conveyed through [the prosecutor's] remark and the absence of an objection by my part, but that wasn't my intent").) Instead, Miller explained his reasoning, making clear that his argument was a function of strategy. He was "fearful that if we didn't get 12 people to agree on self-defense out of the box, that we might have a split jury," and so he attempted to "make it look as if [the trial judge] was the one who tendered [the involuntary manslaughter instruction]" so that "if [the jury was] compromising, they [wouldn't] feel as if they're giving a benefit to either side." (*Id.* at PageID # 8779:9–19; *see id.* at PageID # 8779:19–22 ("It was my belief that I wasn't abandoning the verdict, but giving the jury a third choice if they weren't unanimous on the self-defense.").)[11] Following this hearing, the trial court dismissed this last claim in a written memorandum opinion. (*See People v. Shamlodhiya*, 01-CF-2665 (18th Cir. Cty. of Du Page Jan. 17, 2012), Ex. AA to Answer (hereinafter "2012 Circuit Court Opinion") [25-4], at PageID # 2628, 2631 (analyzing Attorney Miller's actions under *Strickland v. Washington*, 466 U.S. 668 (1984), and holding that Shamlodhiya did not "establish[ ] that counsel's conduct effected a withdrawal of the involuntary manslaughter instruction nor did his performance fall below an objective standard of reasonableness").)

---

[11]     Attorney Miller had also written Shamlodhiya a letter explaining his approach to the closing argument, which Shamlodhiya attached to his initial state postconviction petition. (*See* Jan. 13, 2008 Letter, Ex. Y to Answer [24-16], at PageID # 2203.) In that letter, Miller explains that: "Arguing two contrasting theories to a jury is always difficult. It was my strategic decision to ask for a 'not guilty' verdict . . . . Telling the jury that Involuntary Manslaughter was a 'compromise verdict' necessarily implies a blending of the Defense's request for a 'not guilty' verdict with the state's request for a 'guilty' verdict." (*Id.*)

Shamlodhiya again appealed. First, he argued that "his [trial] attorneys' failure to disclose to him that they would not argue for the lesser included offense of involuntary manslaughter rendered him incapable of making a knowing decision regarding whether to seek a second-degree murder conviction in a bench trial." (2013 Appellate Opinion ¶ 2.) He also again raised his argument regarding the withdrawal of the involuntary manslaughter instruction. (*Id.*) This time, the Appellate Court affirmed the dismissal. (*Id.* at ¶ 20.) Regarding the second-degree murder instruction, the court reasoned that "[t]he content of closing argument is generally considered a matter of trial strategy" (*id.* at ¶ 15 (citations removed)), and that even though the contents of the closing argument here arguably affected Shamlodhiya's right under the Illinois Constitution to decide whether to waive a jury trial, "it is not enough that counsel's argument may have impacted upon [his] decision to seek a bench trial and a conviction of second-degree murder." (*Id.* at ¶¶ 16, 18.) "The mere fact that an issue has constitutional implications does not mean that it necessarily rises to the level of a constitutional deprivation." (*Id.* at ¶ 17.) Regarding the withdrawal of the involuntary manslaughter instruction, the Appellate Court concluded that "nothing in counsel's closing argument [ ] would amount to the functional withdrawal of the involuntary-manslaughter instruction." (*Id.* at ¶ 20.) Thus, the Second District fully affirmed the dismissal. Petitioner's request for rehearing was denied. (*See* Order Denying Petition for Reh'g, Ex. R to Answer [24-3] (reiterating that the content of a closing argument is a matter of trial strategy).) The Illinois Supreme Court denied Petitioner's PLA on September 25, 2013. (*People v. Shamlodhiya*, 996 N.E. 2d 21 (Table), 374 Ill. Dec. 574 (Ill. 2013), Ex. T to Answer (hereinafter ("2013 PLA Denial") [24-5].)

Shamlodhiya filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254 in November 2013. After filing his federal petition, Shamlodhiya sought, and was granted, an "extension of time and/or stay of proceeding" to pursue additional claims in state court. (Minute Entries [29, 31, 41, 43, 50, 54].) This court previously characterized its stay as providing Petitioner

the opportunity to "explore the possibility of filing a successive post-conviction petition in state court on what he characterizes as a new claim: that the trial court's failure to ask *defense counsel* whether they wanted a second-degree murder instruction effectively denied Petitioner's due process and equal protection rights." *United States ex rel. Shamlodhiya v. Dorethy*, No. 13 C 8313, 2015 WL 5731854, at *2 (N.D. Ill. Sept. 30, 2015) (emphasis in original). In his October 2014 Motion for Stay of Proceedings, Shamlodhiya informed the court that he had "filed a successive post-conviction petition in trial court on Sept. 15, 2014, and the [state circuit] court denied it on Sept. 30, 2014." (Motion for Stay of Proceedings [32].) He filed an appeal of that denial, which was denied some time in late 2016 or early 2017. (Status of Petitioner's State Court Proceedings [49] ¶ 1.) The Illinois Supreme Court denied Shamlodhiya's PLA on March 29, 2017. *People v. Shamlodhiya*, 80 N.E. 3d 5 (Table), 414 Ill. Dec. 272 (Ill. 2017). Neither the substance of Petitioner's state court filings, nor the contents of the state courts' decisions, have been filed with this court. Petitioner filed his reply brief in this court on July 28, 2017 following the denial of his PLA, and his habeas petition is now fully briefed.

## DISCUSSION

### I.  Legal Standard

Section 2254 of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") permits a federal district court to grant a writ of habeas corpus for a state prisoner "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. When a state court has adjudicated the merits of a habeas petitioner's claim, the court looks to the "last state court decision to address the merits of a prisoner's claim." *Weaver v. Nicholson*, 892 F.3d 878, 883 (7th Cir.), *cert. denied*, 139 S. Ct. 649 (2018). "[A] federal court may grant habeas relief . . . only when that decision (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;' or (2) 'was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding.' " *Schmidt v. Foster*, 911 F.3d 469, 476–77 (7th Cir. 2018) (quoting §§ 2254(d)(1), (2)). And, of course, before a prisoner may raise any claim in a federal habeas petition, he must first "exhaust his remedies in state court." *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir.), *cert. denied sub nom. Snow v. Nicholson*, 138 S. Ct. 2637, 201 L. Ed. 2d 1030 (2018) (citing *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016); § 2254(b)(1)(A)).

## II.     Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, Shamlodhiya must "show: (1) that [his] attorney provided constitutionally deficient performance; and (2) that the deficient performance prejudiced [his] defense." *Reynolds v. Hepp*, 902 F.3d 699, 704 (7th Cir. 2018) (citing *Strickland v. Washington*, 466 U.S. 688, 687 (1984)). "Counsel is constitutionally deficient if her assistance falls below 'an objective standard of reasonableness.' " *Jordan v. Hepp*, 831 F.3d 837, 846 (7th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88). That standard creates a high hurdle for habeas petitioners: "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Jordan*, 831 F.3d at 846. Combined with "Section 2254(d)(1)'s deferential standard of review of the state court's decision, . . . *Strickland*'s presumption that counsel acted reasonably" creates a " 'doubly' deferential' . . . [standard for reviewing] the state court's decision" in ineffective assistance of counsel claims. *Jordan*, 831 F.3d at 846.

Shamlodhiya's two ineffective assistance of counsel claims are closely related. First, he mirrors his state-court claim on involuntary manslaughter, arguing that his counsel's closing argument "nullified" the involuntary manslaughter instruction. Second, he contends that his trial counsel was "ineffective for misinforming [him] of [counsel's] strategy that led [Shamlodhiya] to make [the] misinformed decision to forego [a] second degree murder instruction to the jury." (Petition at 15.) Notably, this second-degree murder instruction argument is phrased slightly

differently from the argument addressed by the Illinois Appellate Court in its final opinion on the merits. The Appellate Court's 2013 opinion affirmed the trial court's dismissal. The trial court had held that trial counsel was not ineffective under *Strickland*, but the Appellate court did not discuss *Strickland*—instead it held that Attorney Miller's closing argument did not deprive Petitioner of his right to request a bench trial, as guaranteed by the Illinois Constitution. In the present petition, however, Petitioner reverts to his claim from the trial-court level; he asserts that his counsel was ineffective for misleading him, leading to his decision not to request a second-degree murder instruction at all, and to explicitly confirm that decision to the trial judge. (*See* Trial Transcript [25-9] at 966:13–967:1.)

### A.     Involuntary Manslaughter Instruction

The state Appellate Court adjudicated Petitioner's involuntary manslaughter argument on the merits: "we see nothing in counsel's closing argument that would amount to the functional withdrawal of the involuntary-manslaughter instruction." (2013 Appellate Opinion ¶ 20.) The court also "note[d] that the manner in which counsel chose to pursue . . . [his argument] . . . was clearly a matter of trial strategy." (*Id.* at ¶ 23 (citing *People v. Milton*, 354 Ill. App. 3d 283, 289, 820 N.E.2d 1074, 290 Ill. Dec. 7 (1st Dist. 2004)); *see also id.* ("[C]ounsel placed the involuntary-manslaughter instruction before the jury in the way that he believed the jury would be most receptive to it.").) These conclusions are neither contrary to established law nor based on an unreasonable determination of facts.

Whether this determination—that there was no functional withdrawal of the involuntary manslaughter instruction—is a finding of fact or a legal conclusion is debatable. Assuming that the determination was factual, this court's review would be governed by § 2254(d)(2). *See Wood v. Allen*, 558 U.S. 290, 293 (2010) (treating a state court finding that a state postconviction petitioner's "attorneys' failure to pursue and present mitigating evidence of his borderline mental retardation was a strategic decision rather than a negligent omission" as a determination of fact,

and not one of law). As factual determinations, they are entirely reasonable. The Appellate Court looked directly to the contents of Attorney Miller's closing argument. (2013 Appellate Opinion ¶ 21 ("We do not see where in this argument counsel tells the jury to disregard the involuntary-manslaughter instruction.").) It also considered Miller's testimony from the evidentiary hearing. (*See id.* at ¶ 22 (noting that "[Miller] stated that arguing for involuntary manslaughter would have undermined the credibility of his attempt to secure an acquittal on self-defense . . . . Thus, he tried to imply that the involuntary-manslaughter instruction came from the trial judge.").) This court finds nothing unreasonable about those factual findings.

To the extent that the Appellate Court, instead, made legal determinations, those too pass muster under § 2254(d)(1)'s deferential standard. This court has located no Supreme Court law suggesting that Attorney Miller's closing argument did, in fact, unconstitutionally withdraw the involuntary manslaughter instruction. Nor did the Appellate Court's finding that Attorney Miller's closing argument was a matter of trial strategy constitute an unreasonable application of *Strickland. See Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' . . . but which issues to sharpen and how to best clarify them are questions with many reasonable answers.") (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)).

Ultimately, whether characterized as determinations of fact or law, neither of the Appellate Court's determinations regarding the involuntary manslaughter instruction is unreasonable.

### B. Second-Degree Murder Instruction

Next, the court turns to Petitioner's claim that his counsel was ineffective for essentially misleading him in a way that caused him to forego a second-degree murder instruction. In this court's view, that claim is not exhausted, given that the Illinois Appellate Court's holding focused

on the implications of trial counsel's closing argument on Petitioner's rights under the Illinois Constitution (*see* 2013 Appellate Opinion ¶¶ 17–18), while the present Petition focuses solely on an ineffective assistance of counsel claim. *See Snow*, 880 F.3d at 864 ("State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.") (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Respondent has not raised the exhaustion issue, however; in fact, the State oddly concedes that Shamlodhiya exhausted his claims in state court. (*See* Answer to Petitioner's Petition for a Writ of Habeas Corpus [22] at 20.) Thus, the court will address the substance of Petitioner's claim.

It is not clear that any Illinois court directly adjudicated this claim—that counsel was ineffective in counseling him on a second-degree murder instruction—on the merits. The trial court's memorandum opinion on the postconviction proceedings solely addressed Petitioner's involuntary manslaughter claim. (*See* 2012 Circuit Court Opinion at PageID ## 2628–32.) And, as explained above, the Illinois Appellate Court primarily addressed whether Attorney Miller's closing argument violated the Illinois Constitution. The Appellate Court did correctly note that "[t]he content of closing argument is generally considered a matter of trial strategy," (2013 Appellate Opinion ¶ 15 (citing, *inter alia*, *People v. Milton*, 354 Ill. App. 3d 283, 289, 290 Ill. Dec. 7, 820 N.E. 2d 1074 (2004))), and that "it would appear that what defendant is allegedly aggrieved by is a matter of trial strategy, which would not typically be cognizable as a claim of ineffectiveness." (*Id.* (citing *People v. Max*, 2012 IL App (3d) 110385, ¶ 65, 366 Ill. Dec. 443, 980 N.E. 2d 243).) These comments regarding effectiveness of counsel, however, were only dicta.

Still, this court's *de novo* review of Petitioner's second-degree murder instruction claim leads to the same conclusion—counsel's closing statement did not fall below an objective standard of reasonableness, even if counsel's prior discussions with Petitioner did not forecast the specific contents of the closing, and even if that lack of knowledge led Petitioner to decide to

forego a second-degree murder instruction. The Seventh Circuit has often recognized that defense attorneys have wide latitude to make strategic decisions in their closing arguments. *See, e.g.*, *Angelini v. Walls*, 42 F. App'x 888, 889, 890 (7th Cir. 2002) (finding that defense counsel in a sexual assault case made a "reasonable strategic decision," when he "asked the jury to remain objective even though [his client-defendant] looked 'guilty,' 'cold,' 'like he could care less' about the victims, and 'like a rapist' " in an effort to "gain credibility with the jurors"); *Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991) (holding that a lawyer made a reasonable tactical decision when he acknowledged in closing that "the weight of the evidence" was against his client on one charge, in order to contrast it with a lack of evidence against his client on a separate charge). And attorneys are not required to discuss their strategic arguments with clients before closing. *See Underwood*, 939 F.2d at 474 (explaining, in a case where the attorney said in closing, "I think the evidence establishes the commission of that offense" [by his client-defendant], and where the defendant-Petitioner argued in his habeas petition that he had not consented to that admission of his guilt, that "a lawyer is not required to consult with his client on tactical moves."). Therefore, Shamlodhiya's argument here fails.

### III.    Reduction of Sentence

Finally, Petitioner asks the court to "reduce first degree murder to second degree murder." (Petition at 22.) It is not clear whether Shamlodhiya seeks this reduction in his conviction as his preferred relief, in the event his habeas petition is granted, or if he intends to argue that somehow the state courts' failure to reduce his sentence constitutes an independent ground for granting his petition. If it is the former, the court has found that Petitioner's detention does not violate the Constitution or laws of the United States; thus, there are no grounds for reducing his sentence, much less for ordering any state court to modify his conviction record. If it is the latter, Petitioner fails to identify any basis for the court to find that the state courts violated United States law by refusing to reduce his conviction. In fact, it appears that Shamlodhiya failed to properly raise this

argument to a state court, meaning it cannot have been exhausted. As explained by Petitioner, he asked his appellate counsel on direct review to request a reduction of his sentence, but "counsel did not do so because 2nd degree murder instruction[s] were not submitted to the jury." (Petition at 22.) Petitioner further explains that, in postconviction proceedings, he "requested again Appellate counsel to ask Appellate court to reduce conviction to 2nd-degree murder but counsel informed me that Appellate court does not entertain these requests in post-convictions." (*Id.*) Petitioner tried to circumvent this roadblock by writing directly to the Appellate Court himself in late 2012, "requesting the court to please reduce my offense to 2nd-degree murder; the court denied it responding that I have court appointed counsel to plead on my behalf." (*Id.*) Finally, in his postconviction appeal to the Illinois Supreme Court, Shamlodhiya requested the Supreme Court to "reduce 1st-degree murder to 2nd-degree murder." (Attachment to Petition [7-1] at A112.) The Supreme Court summarily denied Petitioner's PLA. (*See* 2013 PLA Denial.) Because it was not properly raised on direct review or in postconviction proceedings, Shamlodhiya's claim is non-cognizable here.

## CONCLUSION

For the foregoing reasons, the court denies Shamlodhiya's petition for a writ of habeas corpus. Because Shamlodhiya has not "made a substantial showing of the denial of a constitutional right," the court declines to grant a certificate of appealability. 28 U.S.C. § 2253(c)(2).

ENTER:

Dated: September 4, 2019

_____
REBECCA R. PALLMEYER
United States District Judge

22